IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WESTPORT INSURANCE | ) | CIVIL ACTION NO. 3:15-cv-251 |
| CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| HIPPO FLEMING & PERTILE LAW | ) | |
| OFFICES and CHARLES WAYNE | ) | |
| HIPPO, JR., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I.    Introduction

Before the Court are the Motion for Summary Judgment (ECF No. 80) filed by

Plaintiff Westport Insurance Corp. ("Westport") and the Cross-Motion for Summary

Judgment (ECF No. 87) filed by Defendants Hippo Fleming & Pertile Law Offices ("HFP")

and Attorney Charles Wayne Hippo, Jr. ("Hippo") (collectively the "Defendants"). These

motions have been fully briefed (ECF Nos. 81-82, 86-88, 91-92) and are ripe for disposition.

This action arises from a dispute involving a professional liability insurance policy

that Westport issued to Defendants (the "Policy"). The action in front of this Court is a

consolidation of two actions involving the same parties and insurance-coverage issues.

Both actions involved Westport's refusal to defend or indemnify HFP and one of its

attorneys, Hippo, in an action brought against them by Gregory S. Morris and Morris

Development, Inc. (collectively "Morris") in the Court of Common Pleas of Blair County,

Pennsylvania (the "Underlying Suit"). (See. ECF No. 81-1 at A002-088.) The Underlying

Suit arises from legal services that Defendants provided Morris in real-estate development matters. Morris alleges that Defendants used information derived from their attorney-client relationship with Morris to benefit their own real-estate development projects, thereby harming Morris.

For the reasons that follow, the Court will **GRANT** Westport's Motion for Summary Judgment on Count I for declaratory judgment and **DENY** it with respect to Counts II and III for rescission and voidance. The Court further **DENIES** Defendants' Cross-Motion for Summary Judgment.

## II.     Jurisdiction and Venue

The Court has subject-matter jurisdiction over the claims and counterclaims in this case under 28 U.S.C. § 1332(a)(1) because it involves citizens of different states and the amount in controversy exceeds $75,000. (*See* ECF No. 1; ECF No. 42 ¶¶ 4-5.)

Because a substantial part of the events giving rise to Westport's claims occurred in the Western District of Pennsylvania, venue is proper in this district under 28 U.S.C. § 1391(b)(2). (*See* ECF No. 1; ECF No. 42 ¶ 7.)

## III.     Relevant Factual History

The following facts are undisputed unless otherwise noted.[1] The Court includes additional material facts in Part VI where necessary.

---

[1] The Court derives these facts from a combination of Westport's Concise Statement of Material Facts (ECF No. 81), the Appendix attached to Westport's Concise Statement of Material Facts (ECF No. 81-1), Defendants' Response to Plaintiffs' Concise Statement of Material Facts and Defendants' Own Concise Statement of Material Facts (ECF No. 86), the Appendix to Defendants' Response to Motion for Summary Judgment and Cross-Motion for Summary Judgment (ECF No. 88), and Westport's Reply to Defendants' Concise Statement of Material Facts (ECF No. 92).

## A. Westport Issues a Professional Liability Insurance Policy to Defendants

HFP applied for professional-liability insurance from Westport in early 2007. (ECF No. 81 ¶ 26; ECF No. 86 ¶ 26.) The application for the Policy included an "Outside Interest Supplement" that broadly required HFP to disclose all outside interests of its attorneys, including all instances where an attorney acts as director, officer, partner, trustee, manager, fiduciary, or otherwise exercises control over a for-profit business other than HFP. (ECF No. 81 ¶ 29; ECF No. 86 ¶ 29.) HFP disclosed the involvement of Hippo and Jeff Fleming ("Fleming"), another HFP attorney, in an outside entity named VIP Ventures, LLC ("VIP Ventures"), but did not disclose the pair's involvement in two other entities—Templar Development, LLC and Templar Elmerton, LLC (collectively the "Templar Entities"). (ECF No. 81 ¶ 33; ECF No. 86 ¶ 33.) VIP Ventures held ownership shares in both of the Templar Entities. (ECF No. 81 ¶ 36; ECF No. 86 ¶ 36.)

Westport issued the Policy—Lawyers Professional Liability Insurance Policy No. WLW305008391200—to HFP in March 2007. (ECF No. 81 ¶ 21; ECF No. 86 ¶ 21.) The Policy covered HFP and its attorneys for certain professional liability claims from March 1, 2007, until March 1, 2008. (ECF No. 81 ¶¶ 21-23; ECF No. 86 ¶¶ 21-23.)

Section VII(C) of the Policy specifically excludes coverage for lawsuits arising from the outside business interests of the insured attorneys (the "Outside Business Exclusion"). The Outside Business Exclusion provides that the Policy does not apply to claims related to "any INSURED'S activities as an officer, director, partner, manager, or employee of any company, corporation, operation, organization, partnership, or association other than the

-3-

NAMED INSURED or PRIOR firm." (ECF No. 81-1 at A106-07; ECF No. 81 ¶ 22; ECF No. 86 ¶ 22.)

## B. Defendants' Representation of Morris and the Underlying Suit

Defendants had a "long-standing" attorney-client relationship with Morris and his business entities. (ECF No. 81-1 at A134.) Morris retained HFP and Hippo to assist Morris with various real-estate development projects. (ECF No. 81-1 at A129; ECF No. 81 ¶ 1; ECF No. 86 ¶ 2.) In early 2008, Morris threatened Defendants with litigation after a dispute arose in the development of a shopping center in Blair County, Pennsylvania. (ECF No. 81-1 at A135; ECF No. 81 ¶ 1; ECF No. 86 ¶ 4.) Morris alleged that Defendants used information from their representation of Morris to benefit real estate development projects that Defendants undertook through the Templar Entities, thereby harming Morris. (ECF No. 81¶¶ 11, 16-18; ECF No. 86 ¶ 11.)

Hippo notified Westport of the threatened litigation via letter on January 9, 2008. (ECF No. 81 ¶ 2; ECF No. 86 ¶ 2.) Westport responded with a letter acknowledging the potential claim and noting that it was not aware of any potential coverage issues. (ECF No. 81-1 at A130.) Then, in October of 2009, Morris sent an unfiled draft complaint to an attorney for Hippo, which Hippo forwarded to Westport. (ECF No. 81 ¶ 4; ECF No. 86 ¶ 4.) Westport sent Hippo a letter on October 30, 2009, where Westport "reserved its rights" and noted that several exclusions in the Policy may bar coverage of Morris's claim. (ECF No. 81-1 at A133.)

The Underlying Suit was officially initiated on December 8, 2009, when the Clerk of Courts for the Court of Common Pleas of Blair County, Pennsylvania issued a Writ of

Summons in a case that Morris brought against Defendants. (*See* ECF No. 81-1 at A141-42.) But due to unrelated bankruptcy proceedings, Morris took no action in the Underlying Suit until they first filed a complaint on July 24, 2015. (ECF No. 81-1 at A002; ECF No. 81 ¶ 9; ECF No. 86 ¶ 9.) In the period between the filing of the Writ of Summons and Complaint in the Underlying Suit, Westport retained Attorney Edwin Schwartz of Harrisburg, Pennsylvania to represent Defendants in the Underlying Suit.[2] (ECF No. 86 at 21 ¶ 8; ECF No. 92 ¶¶ 22-23, 25-27.)

Morris's Complaint against Defendants contains eleven counts: (1) negligence (i.e., legal malpractice); (2) breach of contract; (3) breach of fiduciary duties; (4) interference with contractual relationship; (5) constructive trust; (6) unjust enrichment; (7) a violation of the Unfair Trade Practices and Consumer Protection Act; (8) civil conspiracy; (9) conversion; (10) defamation; and (11) vicarious liability. (ECF No. 81-1 at A002-070; ECF No. 81 ¶ 10; ECF No. 86 ¶ 10.)

## C. Westport Refuses to Defend or Indemnify Defendants Against the Underlying Suit

Westport evaluated coverage for the Underlying Suit after Morris filed the Complaint against Defendants in 2015. (ECF No. 81 ¶ 25; ECF No. 86 ¶ 25.) On August 11, 2015, Westport sent Defendants a letter stating that Westport was denying coverage for the Underlying Suit based on the Policy's Outside Business Exclusion. (ECF No. 81-1 at A410; ECF No. 81 ¶ 25; ECF No. 86 ¶ 25.) Westport's denial of coverage triggered this litigation. Section IV addresses the procedural history of the action pending in this Court.

---

[2] The parties dispute the materiality of this fact. Specifically, Westport claims that its retention of Attorney Schwartz on behalf of Defendants is immaterial to the Court's determination on whether the Policy's Outside Business Exclusion applies. (ECF No. 92 ¶¶ 21-25.)

## IV. Relevant Procedural History[3]

The action pending in this Court is the consolidation of two separately filed cases relating to the Policy that Westport issued to Defendants. In the first action, Westport brought a declaratory judgment action against Defendants in this Court on September 29, 2015. (ECF No. 1.) Westport seeks a declaratory judgment that it has no duty or obligation to defend or indemnify Defendants in the Underlying Suit.

In the second action, HFP and Hippo filed a Complaint against Westport in the Court of Common Pleas of Blair County, Pennsylvania on November 30, 2015. (*See* 3:15-cv-0322, ECF No. 1-A1.) HFP and Hippo brought claims against Westport for declaratory judgment, breach of contract, and bad faith stemming from Westport's refusal to defend and indemnify Defendants in the Underlying Suit. (*Id.*) Westport removed this action to this Court on December 11, 2015. (*See* 3:15-cv-0322, ECF No. 1.) The Court denied Defendants' Motion to Remand the case to state court (3:15-cv-0322, ECF No. 17) and denied Defendants' Motion to Dismiss for lack of jurisdiction (ECF No. 36).

In May of 2016, the Court entered an Order (ECF No. 39; 3:15-cv-0322, ECF No. 19) granting the parties' Joint Motion to Consolidate (ECF No. 38), thereby combining the two ongoing actions between Westport and Defendants into the instant action.

After consolidation, the parties litigated a discovery dispute. (ECF Nos. 47-56, 65-66.) Additionally, Westport filed its First Amended Complaint (ECF No. 67) in March of 2017. Westport added claims to rescind the policy (Count II) and for voidance (Count III)

---

[3] This case is the consolidation of two separate actions filed in this Court. Unless otherwise specified, all citations are to the docket in Civil Case No. 3:15-cv-251. Citations to the docket in other case, numbered Civil Case No. 3:15-cv-0322 before consolidation, are specifically noted.

-6-

based on Defendants' failure to disclose their outside business interests in their application for the Policy. (*Id.*)

The case reached its current posture in early 2018 when the Court entered Orders (ECF Nos. 74, 77, 79) setting a briefing schedule. Westport filed its Motion for Summary Judgment, Brief in Support, and Concise Statement of Material Facts on May 18, 2018. (ECF Nos. 80-82.) Defendants filed a Response to Westport's Motion for Summary Judgment and Cross-Motion for Summary Judgment, Brief in Support, and Concise Statement of Material Facts on June 18, 2018. (ECF Nos. 85-87.) Finally, Westport filed its Reply Brief and Reply to Defendants' Concise Statement of Material Facts on August 3, 2018. (ECF No. 91-92.)

## V.    Legal Standard

"Summary judgment is appropriate only where . . . there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle*

-7-

*Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11, (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).

## VI. Discussion

### A. The Language of the Policy Is Clear and Unambiguous

The general rules of contract interpretation apply to the interpretation of insurance policies. *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir. 1999); *Mohn v. Am. Cas. Co. of Reading*, 326 A.2d 346, 351-52 (Pa. 1974) ("A contract of insurance like any other contract requires that the intention of the parties be determined from the words of the instrument.").

Under Pennsylvania law, courts interpret unambiguous writings as a matter of law, while ambiguous writings are interpreted by the finder of fact. *First Guard Ins. Co. v. Bloom Servs., Inc.*, No. 3:15-59, 2018 WL 949224, at *4 (W.D. Pa. Feb. 6, 2018) (Gibson, J.); *Kripp v. Kripp*, 849 A.2d 1159, 1163-64 (Pa. 2004) ("While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.").

"[T]he question of whether a contract is ambiguous is a question of law." *Kripp*, 849 A.2d at 1164 n.5 (citing *Easton v. Wash. Cty. Ins. Co.*, 137 A.2d 332 (Pa. 1957)); *see also Ankerstjerne v. Schlumberger, Ltd.*, 155 F. App'x 48, 49-50 (3d Cir. 2005) (citing *St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 (3d Cir. 1991)).

When the language of an insurance policy is clear and unambiguous, courts must give effect to the policy's language. *401 Fourth St., Inc. v. Inv'rs Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005) (citing *Gene & Harvey Builders, Inc. v. Pa. Manufacturers' Ass'n Ins. Co.*, 517 A.2d 910, 913 (Pa. 1986)); *Nationwide Mut. Ins. Co. v. CPB Int'l, Inc.*, 562 F.3d 591, 595 (3d Cir. 2009) (quoting *Donegal Mut. Ins. Co. v. Baumhammers*, 938 A.2d 286, 290 (Pa. 2007)).

The purpose of interpreting an insurance policy is "to ascertain the intent of the parties as manifested by the language of the written agreement." *Mut. Benefits Ins. Co. v. Haver*, 725 A.2d 743, 746 (Pa. 1999) (quoting *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983)).

Here, the language of the Policy is clear and unambiguous. The Policy's Outside Business Exclusion, which appears in Section VII(C), states that:

> [the Policy] shall not apply to any CLAIM based upon, attributable to, or directly or indirectly resulting from . . . any INSURED'S activities as an officer, director, partner, manager, or employee of any company, corporation, operation, organization, partnership, or association other than the NAMED INSURED or PRIOR FIRM, except as a member, director, or officer of any Bar Association, its governing board or any of its committees, or as a member of a formal accreditation, ethics, peer review, licensing board, standards review, or similar professional board or committee related to the practice of law.

(ECF No. 81-1 at A106-07.)

While the language of the Outside Business Exclusion is broad, it is reasonably susceptible to only one interpretation. The Policy does not apply to *any* claim that arises from an HFP attorney's involvement as an officer, director, partner, manager, or employee of any entity other than HFP. The broad language of the Outside Business Exclusion—that the Policy shall not apply to claims "based on, attributable to, or directly or indirectly resulting from"—clearly excludes coverage for any claim arising from an attorney's outside business activities, regardless of the extent or degree that the claim involves an attorney's outside business activities. Taken as a whole, the language of the Policy's Outside Business Exclusion unambiguously indicates that the parties' intention

-10-

was to exclude coverage for any and all claims arising from the outside business activities of HFP attorneys. Thus, the Court must give full effect to the Policy's language.

### B. There Is No Genuine Dispute of Material Fact that the Allegations In the Underlying Complaint Trigger the Policy's Outside Business Exclusion

#### 1. The Templar Entities Are Outside Business Entities

There is no genuine dispute of material fact that the Templar Entities are uninsured outside business entities under the Policy. The Outside Business Exclusion applies to "any company, corporation, operation, organization, partnership, or association other than the NAMED INSURED or PRIOR FIRM." (ECF No. 81-1 at A107.) The parties do not dispute that the Templar Entities are wholly distinct entities from HFP, the sole insured entity under the Policy. (*See* ECF No. 81 ¶¶ 35, 57, 59; ECF No. 86 ¶¶ 35, 57, 59) (establishing that both of the Templar Entities are LLCs that filed Certificates of Organization with the Pennsylvania Secretary of State).

Moreover, Defendants admit that the explicit purpose of the Templar Entities was for Hippo and Fleming to conduct business in a way that was not associated with HFP. Defendants established VIP Ventures and the Templar Entities to "keep their outside business earnings separate from the [earnings of] the [HFP] law firm." (ECF No. 81 ¶ 39; ECF No. 86 ¶ 39.) Hippo testified in a deposition that VIP Ventures and the Templar Entities were "a way of isolating money [from HFP]" (ECF No. 81-1 at A425) and that any earnings from the Templar Entities were paid through VIP Ventures, not HFP. (*Id.* at A427.) Therefore, there is no dispute that the Templar Entities are outside business interests independent of HFP.

### 2. Hippo Acted as an Officer, Partner, Director, and Manager of the Templar Entities

The Policy's Outside Business Exclusion bars coverage for any claim arising from an insured attorney's work "as an officer, partner, director, [or] manager . . . of any company . . . other than the named insured." (ECF No. 81-1 at A106-07.) There is no genuine dispute that Hippo acted as an officer, director, and partner of the Templar Entities. Similarly, there is no genuine dispute that Fleming acted as a partner of the Templar Entities.

First, Hippo acted as an officer of the Templar Entities. An officer is "a person elected or appointed by the board of directors to manage the daily operations of a corporation, such as CEO, president, secretary, or treasurer." *Officer*, BLACK'S LAW DICTIONARY (10th ed. 2014). Moreover, a de facto officer is "[s]omeone who is acting under color of right and with apparent authority but who is not legally a corporate officer." *Officer de Facto*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also Music Grp. Macao Commer. Offshore, Ltd. v. Foote*, No. 14-cv-03078, 2015 WL 3882448, at \*68 (N.D. Cal. June 22, 2015) ("[C]ourts will recognize a de facto officer where the apparent officer assumes possession of an officer under the claim and color of election or appointment and actually discharges the duty of that office.").

Defendants maintain that Hippo was not an officer of the Templar Entities and, alternatively, that the Templar Entities did not have officers. (*See* ECF No. 86 at 23 ¶ 13.) However, there is no dispute that Hippo held himself out as an officer of both Templar Development and Templar Elmerton. Hippo testified in a deposition that he held himself

out as Templar Development's "Vice President of Operations." (*Id.* at 24 ¶ 16; ECF No. 88 at A619.) A vice president is "[a] corporate officer of mid-level to high rank." *Vice President*, BLACK'S LAW DICTIONARY (10th ed. 2014). Hippo obtained business cards that listed him as Templar Development's Vice President of Operations, which clearly indicates that he intended to hold himself out as an officer of Templar Development. (ECF No. 86 at 24, ¶ 16; ECF No. 92 ¶ 16.) Further, Hippo was also the President of Templar Development for a period of time.[4] (*See* ECF No. 67 ¶¶ 42-43; ECF No. 68 ¶¶ 42-43.) Defendants argue that Hippo was not an officer because he was not given an official title in Templar Development's operating agreement. (*See* ECF No. 81 ¶ 42; ECF No. 86 ¶ 42.) This distinction is irrelevant, however, because Hippo was at the very least a de facto officer after holding himself out as Templar Development's President and Vice President of Operations and conducting business on its behalf.[5] Defendants also admitted that Hippo served as both President and Vice President of Operations for

---

[4] In its First Amended Complaint, Westport alleged (1) that Hippo was the President of Templar Development at the inception of the Policy and (2) that Hippo held himself out as the President of Templar Development to the Secretary of State of Pennsylvania. (ECF No. 67 ¶¶ 42-43.) Defendants admitted these allegations in their Answer to the Amended Complaint. (ECF No. 68 ¶¶ 42-43.) However, Defendants deny the same factual allegations in their Response to Plaintiff's Concise Statement of Material Facts without any further explanation. (ECF No. 86 ¶ 44.)

[5] *See In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 48 (Del. 2006) ("A *de facto* officer is one who actually assumes possession of an office under the claim and color of an election or appointment and who is actually discharging the duties of that office, but for some legal reason lacks *de jure* title to that office."). Here, Hippo did not assume his position as Vice President of the Templar Entities under the claim and color of an election. However, Hippo's holding himself out as Vice President of Operations (and President) of the Templar Entities shows that he was acting under color of appointment, regardless of the structure of the Templar Entities and the appointment processes they had in place.

Templar Elmerton.[6]  (ECF No. 67 ¶¶ 54-56; ECF No. 68 ¶¶ 54-56.)  Thus, there is no dispute that Hippo was an officer of the Templar Entities.

Second, Hippo and Fleming acted as partners of the Templar Entities.  A partner is "[s]omeone who shares or takes part with another, especially in a venture with shared benefits and shared risks" or "[o]ne of two or more persons who jointly own and carry on a business for profit."  *Partner*, BLACK'S LAW DICTIONARY (10th ed. 2014).

Hippo and Fleming were partners of the Templar Entities because they jointly carried on business for profit through the Templar Entities.  Defendants admit that Hippo "performed various dealings on behalf of Templar Development" by drafting purchase agreements to acquire property, seeking out potential buyers, and negotiating with potential tenants.  (ECF No. 81 ¶ 50; ECF No. 86 ¶ 50.)  Moreover, both Hippo and Fleming shared the benefits and risks associated with the Templar Entities.  Defendants admit that Hippo and Fleming had a financial stake in both Templar Entities, thereby sharing risks and benefits.[7]  (ECF No. 81 ¶¶ 46-47, 56; ECF No. 86 ¶¶ 46-47, 56.)  Fleming testified that he became involved with the Templar Entities because he "was willing to take a great deal of risk for a potential return."  (ECF No. 81-1 at A511.)  Similarly, when

---

[6] In its First Amended Complaint, Westport alleged (1) that Hippo was the President of Templar Elmerton at the inception of the Policy, (2) that Hippo held himself out as the President of Templar Elmerton to the Secretary of State of Pennsylvania, and (3) that Hippo held himself out as Templar Elmerton's Vice President of Operations.  (ECF No. 67 ¶¶ 54-56.)  Defendants admitted these allegations in their Answer to the Amended Complaint.  (ECF No. 68 ¶¶ 54-56.)  However, Defendants deny the same factual allegations in their Response to Plaintiff's Concise Statement of Material Facts without any further explanation.  (ECF No. 86 ¶ 61.)

[7] Defendants argue that Hippo and Fleming did not have any personal financial stake in the Templar Entities because their ownership was through VIP Ventures.  However, this is a meritless distinction because Hippo and Fleming both were personally invested in the Templar Entities through VIP Ventures.

asked about a hotel deal that Templar Development pursued, Hippo testified that he "stood the chance of losing [his] shirt." (*Id.* at A546.) Therefore, there is no genuine dispute that Hippo and Fleming were partners in the Templar Entities.

Third, Hippo acted as both a director and manager of the Templar Entities. A director is "[s]omeone who manages, guides, or orders; a chief administrator" or "[a] person appointed or elected to sit on a board that manages the affairs of a corporation . . . by exercising control over its affairs." *Director*, BLACK'S LAW DICTIONARY (10th ed. 2014). Similarly, a manager is generally "[s]omeone who administers or supervises the affairs of a business." *Manager*, BLACK'S LAW DICTIONARY (10th ed. 2014). Under Pennsylvania LLC law, a manager is broadly defined as someone who is responsible for controlling matters relating to the affairs and activities of the company. *See* 15 PA. CONS. STAT. §§ 8812(a); 8847(c).

There is no dispute that Hippo exercised some degree of control over the affairs of the Templar Entities.[8] It is undisputed that Hippo performed significant work on behalf of the Templar Entities.[9] (ECF No. 81 ¶ 50; ECF No. 86 ¶ 50.) Hippo testified that his role

---

[8] The parties do not dispute that Hippo had some degree of managerial control over Templar Elmerton. In its Complaint, Westport alleged that Hippo "exercised managerial and/or fiduciary control over Templar Elmerton, LLC." (ECF No. 67 ¶ 58.) In their Answer, Defendants merely denied that Hippo had any authority to act "*on his own.*" (ECF No. 68 ¶ 58) (emphasis added). Defendants do not dispute that Hippo exercised some control over the Templar Entities and managed their affairs to some extent.

[9] The Court recognizes that Hippo loosely carried on an attorney-client relationship with Templar Development. However, it is clear that Hippo's involvement with the Templar Entities exceeded the scope of any attorney-client relationship. When testifying about his involvement with Templar Development, Hippo characterized his decision to focus on his law practice as: "do I do this [work for Templar Development] or practice law? I had to focus on my practice, that took more and more away from this [work for Templar Development]." (ECF No. 81-1 at A343.) This testimony indicates that Hippo's work for Templar Development was distinct from his legal practice. Similarly, Hippo could not straightforwardly testify as to whether Templar Development was a

-15-

at Templar Development was "to get the job done. There were certain things that had to take place to get it done. I was doing what I could to advance what we were trying to accomplish." (ECF No. 81-1 at A211.) Hippo admits that he made business decisions regarding the Templar Entities' real estate projects, including major strategic decisions. (*Id.* at A200-225.) For instance, Hippo testified that he made an offer on behalf of Templar Development to purchase a piece of property on Route 22 in Blairsville, Pennsylvania, because he thought a client of HFP may be interested in developing the property into a service station. (*Id.* at A286-88.) Collectively, Hippo's title as Vice President of Development, his own description of his role at Templar Development, and his actions on Templar Development's behalf lead to the conclusion that he was responsible for carrying out Templar Development's affairs and activities. Thus, Hippo was a director and manager of the Templar Entities.

In sum, there is no genuine dispute of material fact that Hippo was an officer, director, and manager of the Templar Entities. Similarly, there is no dispute of material fact that both Hippo and Fleming were partners of the Templar Entities. Hippo and Fleming's involvement with the Templar Entities therefore triggers the Policy's Outside Business Exclusion.

---

client of his law firm, which further indicates that Hippo's work for Templar Development was distinct from his law practice. (*Id.* at A426.) Thus, it is clear that Hippo's decision-making on behalf of Templar Development was more than advice from attorney to client.

### 3. All Claims In the Underlying Suit Resulted From Hippo's Involvement with the Templar Entities, Thereby Triggering the Outside Business Exclusion

An insurer has a duty to "defend its insured if the factual allegations of the complaint on its face encompass an injury . . . that is potentially within the scope of the policy." *State Auto Mut. Ins. Co. v. Lucchesi*, 563 F. App'x. 186, 189 (3d Cir. 2014) (internal quotation marks omitted) (quoting *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 534 (Pa. 2010)); *see also Gen Accident Ins. Co. of Am. v. Allen*, 692 A.2d 1089, 1095 (Pa. 1997); *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir. 1999); *J.H. France Refractories Co. v. Allstate Ins. Co.*, 626 A.2d 502, 507 (Pa. 1993). "The question of whether a claim against an insured is potentially covered is answered by comparing the four corners of the insurance contract to the four corners of the complaint." *Jerry's Sport Ctr., Inc.*, 2 A.3d at 541 (citing *Baumhammers*, 938 A.2d at 290).

An insurer has no duty to defend, however, where all the claims within a cause of action are clearly excluded from coverage under the policy. *Lucchesi*, 563 F. App'x at 190; *Penn-America Ins. Co. v. Peccadillos, Inc.*, 27 A.3d 259, 267 (Pa. Super. Ct. 2011). An insurance company's "obligation to defend remains unless [an] exclusion clearly defeats every cause of action averred in the underlying complaint." *Peccadillos, Inc.*, 27 A.3d at 267. The insurer bears the burden of proving that the exclusion unambiguously applies under the circumstances. *Bishops, Inc. v. Penn Nat'l Ins.*, 984 A.2d 982, 990 (Pa. Super. Ct. 2009) (citing *Spece v. Erie Ins. Grp.*, 850 A.2d 679, 682 (Pa. Super. Ct. 2004)).

Here, as discussed in Section VI(A), the language of the Policy and Outside Business Exclusion is clear and unambiguous. Therefore, to determine if Westport

properly denied coverage, the Court must compare the Policy's language to the Complaint in the Underlying Suit to decide whether each count falls within the Outside Business Exclusion.

Defendants, however, "are not arguing that the **entire underlying litigation** arises **solely** out of Defendants' alleged breach of the standard of care attorneys owe their clients." (ECF No. 87 at 16) (emphasis in original.) Rather, Defendants argue that Counts I and II in the Underlying Suit—for legal malpractice and breach of contract—arise solely from Hippo's attorney-client relationship with Morris, thereby triggering Westport's duty to defend the entire suit. (*Id.*) Defendants admit that each of the nine other counts in the Underlying Complaint involve Hippo's outside businesses. (*Id.*) Accordingly, to determine if the Policy's Outside Business Exclusion applies to Counts I and II in the Underlying Suit, the Court confines its inquiry to whether Counts I and II arise solely from the attorney-client relationship between Hippo and Morris.

In arguing that Counts I and II of the Underlying Complaint arise solely from the attorney-client relationship between Morris and Hippo, Defendants contend that Counts I and II do not involve the Templar Entities. (*Id.* at 21.) While Counts I and II certainly involve an attorney-client relationship between Hippo and Morris, they also explicitly involve Hippo's outside business activities with the Templar Entities.

Defendants argue that "[o]f the 12 paragraphs that appear in Count I . . . **none** of them mention Templar." (*Id.*) (emphasis in original.) This claim is clearly false. Paragraph 73, which is contained within Count I of the Underlying Complaint, mentions the Templar Entities four times. (*See* ECF No. 67-2 ¶ 73.) Count I alleges: (1) that Hippo

-18-

improperly provided information to Templar Development to benefit his own competing real estate projects (*id.* ¶ 73(d)); (2) that Hippo worked in concert with one of Morris's employees to seek out and facilitate real estate development opportunities for the Templar Entities (*id.* ¶ 73(f)); (3) that Hippo procured financing and development opportunities on behalf of the Templar Entities instead of the Morris entities (*id.* ¶ 73(i)); and (4) that Hippo charged Morris legal fees and expenses for time that Hippo spent advancing the interests of the Templar Entities (*id.* ¶ 73(r)).

Defendants similarly argue that none of the paragraphs in Count II of the Underlying Complaint mention the Templar Entities. (ECF No. 87 at 22.) But the Templar Entities are also mentioned three times in the paragraphs under Count II. (*See* ECF No. 67-2 ¶¶ 80(i); 80(r); 81(i).) Like in Count I, the paragraphs mentioning the Templar Entities under Count II allege that Hippo used information he obtained in his representation of Morris to usurp development and financing opportunities to benefit the Templar Entities. (*Id.*)

The plain language of the Complaint in the Underlying Suit entirely discredits Defendants' argument that Counts I and II are based solely on Hippo's role as Morris's attorney. Rather, the allegations in Morris's Complaint straightforwardly characterize the legal malpractice and breach of contract claims as resulting from Hippo's self-dealing on behalf of the Templar Entities. Put differently, Counts I and II of the Complaint allege that Hippo committed legal malpractice and breach of contract by simultaneously acting as Morris's attorney and a competing real-estate developer.

-19-

Therefore, Westport has no duty to defend because each claim in the Underlying Suit falls unambiguously within the Policy's Outside Business Exclusion. *See Peccadillos*, 27 A.3d at 567 (holding that an insurer's "obligation to defend remains unless [an] exclusion clearly defeats every cause of action averred in the underlying complaint"); *Biborosch v. Transamerica Ins. Co.*, 603 A.2d 1050, 1057-58 (Pa. Super. Ct. 1992) ("[I]n order to find a duty to defend . . . we need only determine if any claims asserted are potentially covered. If any are, the insurer must defend until the suit is narrowed only to claims that are definitely not within that coverage.").

Moreover, prior decisions applying Pennsylvania law to insurance-coverage disputes involving similar outside business exclusions indicate that Westport properly denied coverage. In these cases, courts have held that outside business exclusions bar coverage whenever each claim in a suit results from the insured's simultaneous involvement with both insured and uninsured entities. *See Cont'l Cas. Co. v. Adams*, No. 3:CV02-1122, 2003 WL 22162379, at *9 (M.D. Pa. Sept. 12, 2003) (holding that an insurer's denial of coverage was proper "where a named insured acted simultaneously on behalf of the interests of an insured and an uninsured entity"); *Niagra Fire Ins. Co. v. Pepicelli*, 821 F.2d 216, 220-21 (3d Cir. 1987) (holding that an outside business exclusion bars coverage whenever a lawsuit arises from an attorney acting simultaneously as both an attorney and officer or director of an uninsured business, but concluding that the exclusion did not apply to the malpractice claim against the attorney because that claim did not result from the attorney's outside business interests); *Coregis Ins. Co. v. LaRocca*, 80 F. Supp. 2d 452, 457 (E.D. Pa. 1999) (holding that the other business exclusion in an attorney's malpractice

insurance policy barred coverage because the underlying malpractice claims "involve overlap between LaRocca's role as legal counsel and partner/trustee [of the other business]").

The parties' briefs discuss *Niagra Fire Insurance Company v. Pepicelli*, 821 F.2d 216 (3d Cir. 1987), at length. (*See* ECF No. 82 at 11-12; ECF No. 87 at 7-12; ECF No. 91 at 9-10.) In *Pepicelli*, Attorney Pepicelli was sued for malpractice for failing to join a party in a lawsuit to recover insurance proceeds. 821 F.2d at 218. The underlying suit involved a tire company's action against an insurance company to collect proceeds from a fire and hazard insurance policy. *Id.* at 217. The malpractice suit was based upon Attorney Pepicelli's failure to join another tire company in the lawsuit. *Id*. Attorney Pepicelli's malpractice insurance carrier denied coverage of the malpractice suit because Attorney Pepicelli was the sole shareholder of one of the tire companies involved in the underlying insurance dispute. *Id.* The malpractice insurance carrier denied coverage for the malpractice suit based on an exclusion in the policy that applied to "any claim arising out of any insured's activities as an officer or director of any . . . business other than that of the named insured." *Id.* at 218. The Third Circuit held that this outside business exclusion did not bar coverage for the malpractice suit because "[n]either the actions nor the interest of Pepicelli in his [outside] business venture . . . are at issue in the malpractice suit." *Id.* at 220. The Court held that although Attorney Pepicelli was an officer and director of one of the involved tire companies, the malpractice suit was based solely on Pepicelli's negligent legal representation and "did not simultaneously involve business decisions by Pepicelli [on behalf of his tire company]." *Id.*

-21-

*Pepicelli* is clearly distinguishable from the instant case. Here, Morris's Complaint in the Underlying Suit is not based solely on Hippo's legal representation. Rather, Morris's Complaint is based on Hippo acting simultaneously as Morris's lawyer and a competing real-estate developer. In *Pepicelli*, Attorney Pepicelli's outside business interest was involved in the underlying malpractice suit only as "as a player in the factual background." *Id.* at 221. The underlying malpractice suit there did not involve allegations that Attorney Pepicelli harmed his client in favor his own business interests. The Third Circuit held that the outside business exclusion did not apply because the underlying suit there was based "solely on Pepicelli and the Law Firm's legal representation." *Id.* But here, by contrast, none of the counts in the Underlying Suit are based solely on Hippo's negligent legal representation. Rather, each count in the Underlying Suit alleges that Hippo acted to benefit his own business interests to Morris's detriment, despite their attorney-client relationship.[10] Defendants' reliance on *Pepicelli* is therefore unpersuasive. *See also Westport Ins. Corp. v. Bayer*, 284 F.3d 489, 493-94, 497-99 (3d Cir. 2002) (finding that the outside business exclusion in a Westport malpractice policy did not apply because the defendant-attorney was not a director, partner, manager or employee of any entity other than his law firm and did not operate or control the outside entity in question).

---

[10] Morris's Complaint in the Underlying Suit mentions the Templar Entities more than fifty times. Each of the first five counts in the Complaint explicitly mention the Templar Entities. (*See* ECF No. 81-1 at A005-052.) While counts VI-XI do not explicitly mention the Templar Entities, they are based on Hippo's self-dealing, which took place on behalf of the Templar Entities. (*Id.* at A053-069.) Therefore, allegations in prior counts that mention the Templar Entities by name are clearly incorporated by reference into the final six counts of the Complaint in the Underlying Suit.

The instant case is much more like *Coregis Insurance Company v. LaRocca*, 80 F. Supp. 2d 452 (E.D. Pa. 1999), where an insurance policy's outside business exclusion barred coverage because the attorney acted simultaneously as an attorney and as a partner in a real-estate business. *Id.* at 453. The language of the exclusion in the malpractice insurance policy in *LaRocca* is indistinguishable from the Policy's Outside Business Exclusion here. *Id.* at 454. The Eastern District of Pennsylvania applied *Pepicelli* and determined that the exclusion applied to Attorney LaRocca because the "allegations involve overlap between LaRocca's role as legal counsel and partner/trustee [of an outside business]." *Id.* at 457. The *LaRocca* Court held that "the underlying legal malpractice claims simultaneously involved business decisions by LaRocca, which is the precise scenario under which the Court of Appeals for the Third Circuit [in *Pepicelli*] suggested that such an exclusion would apply." *Id.* (internal quotation marks omitted) (citing *Pepicelli*, 821 F.2d at 221); *see also Coregis Ins. Co. v. Bartos, Broughal & DeVito, LLP*, 37 F. Supp. 2d 391, 392-95 (E.D. Pa. 1999) (finding that a malpractice insurance policy's outside business exclusion barred coverage in a legal malpractice suit where an attorney simultaneously acted as an attorney and an officer of an investment partnership).

In conclusion, a comparison of the unambiguous language of the Policy to the four corners of Morris's Complaint in the Underlying Suit clearly leads to the conclusion that the Outside Business Exclusion applies to all counts in the Underlying Suit as a matter of law, therefore excluding coverage. There is no genuine dispute of material fact that all counts in the Underlying Suit involve the Templar Entities and Hippo's outside business activities. Therefore, the Court finds that Westport is entitled to summary judgment

because it properly denied coverage of the Underlying Suit under the Policy's Outside Business Exclusion.

### C. There Are Genuine Disputes of Material Fact Regarding Counts II and III of Westport's Complaint for Rescission and Voidance

Westport filed its First Amended Complaint on March 16, 2017, to add counts for rescission and voidance of the Policy. (*See* ECF No. 67.) Westport alleges that the Policy should be rescinded and declared void because Defendants failed to disclose their involvement with the Templar Entities on their application for the Policy. (*Id.* at 12-14.)

#### 1. There Are Genuine Disputes of Material Fact that Preclude Summary Judgment on Westport's Claims for Rescission and Voidance

Under Pennsylvania law, an insurer may seek judicial cancellation of an insurance policy where the execution of the insurance contract is induced by the insured's fraudulent misrepresentations. *See Rohm & Haas Co. v. Cont'l. Cas. Co.*, 732 A.2d 1236, 1251-52 (Pa. 1999) (citing *Tudor Ins. Co. v. Twp. of Stowe*, 697 A.2d 1010, 1016 (Pa. Super. Ct. 1997); *N.Y. Life Ins. Co. v. Brandwene*, 172 A. 669, 669-70 (Pa. 1934)). "[R]escission is an equitable remedy that a court may grant when an insurer proves fraud by the insured in obtaining the policy." *Clark v. Allstate Ins. Co.*, No. 10-294, 2010 WL 1904013, at *3 (W.D. Pa. May 7, 2010).

There are two distinct but similar grounds for rescission and voidance of an insurance policy under Pennsylvania law. First, an insurance policy is void *ab initio* for misrepresentation when the insurer can establish that (1) the representation was false, (2) the insured knew it to be false when made or acted in bad faith, and (3) the representation was material to the risk being insured. *Lutheran Brown v. Kraynak*, 32 Fed. App'x. 19, 19-20

(3d Cir. 2002); *Matinchek v. John Alden Life Ins. Co.*, 93 F.3d 96, 102 (3d Cir. 1996); *Shafer v. John Hancock Mut. Life Ins. Co.*, 189 A.2d 234, 236 (Pa. 1963). Second, rescission is also available where an insurer can show clear and convincing evidence that the insured knowingly failed to disclose information which was material to the risk to be insured. *Clark*, 2010 WL 190401, at *3 (citing *Rohm*, 732 A.2d at 1251). To rescind a policy on this ground, the insurer must prove a fraudulent intent to deliberately deceive. *Rohm*, 732 A.2d at 1251 (citing *Grimes v. Prudential Ins. Co. of Am.*, 585 A.2d 29, 33 (Pa. Super. Ct. 1991)).

Claims for rescission of an insurance policy are typically fact intensive. To satisfy the clear and convincing evidence standard, the evidence presented must be "so clear, direct, weighty, and convincing as to enable the jury to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Id.* (quoting *Lessner v. Rubinson*, 592 A.2d 678, 681 (Pa. 1991)). "[T]he failure to furnish all details asked for [on an insurance application], where it appears there is no intention of concealing the truth, does not work a forfeiture, and a forfeiture does not follow where there has been no deliberate intent to deceive, and the known falsity of the answer is not affirmatively shown." *Grimes*, 585 A.2d at 33. "[F]raud . . . is never proclaimed from the housetops nor is it done otherwise than surreptitiously with every effort to conceal the truth of what is being done. So fraud can rarely if ever be shown by direct proof. It must necessarily be largely inferred from the surrounding circumstances." *Id.* (quoting *Shechter v. Shechter*, 76 A.2d 753, 755 (Pa. 1950)).

Here, there is no dispute that Defendants omitted the Templar Entities from their application for the Westport Policy. (*See* ECF No. 86 ¶ 33) ("Defendants admit that HFP did not disclose Templar Development or Templar Elmerton in the Outside Interest Supplement [to the application for the Policy]."). However, there are disputes of material fact that preclude summary judgment for Westport on its claim for rescission of the Policy.

First, there is a genuine dispute as to whether Defendants knowingly and intentionally misled Westport by failing to disclose the Templar Entities in their application for the Policy. Defendants argue that they did not disclose the Templar Entities on the application for the Policy because VIP Ventures, another outside entity which Defendants disclosed on the application, was the actual owner of the Templar Entities. (*Id.* at 22, ¶ 10.) Fleming, the HFP attorney who filled out the application for the Policy, testified that he did not disclose the Templar Entities on the application because he disclosed VIP Ventures, the outside entity that technically held Hippo and Fleming's ownership shares in the Templar Entities. (ECF No. 81-1 at A517.) He further testified that he had no reason to believe that he or HFP would intentionally omit the Templar Entities on the application for the Policy. (ECF No. 81-1 at A512; ECF No. 86 at 22, ¶ 10.) Thus, Westport is not entitled to summary judgment on its claim for rescission because there is a genuine dispute of material fact as to whether HFP, through Fleming, acted in bad faith or with the intent to deceive when he filled out the application for the Policy.

Second, there is a genuine dispute as to whether Defendants' nondisclosure was material to the risk to be insured. A misrepresentation on an insurance application is

material if the "information would influence the decision of an issuer in the issuance of a policy, assessing the nature of the risk, or setting premium rates." *A.G. Allebach, Inc. v. Hurley*, 540 A.2d 289, 294-95 (Pa. Super. Ct. 1988).

Westport offers the affidavit of a former underwriter who stated that Westport would have issued the Policy differently had Defendants disclosed their involvement with the Templar Entities on the application. (ECF No. 81-1 at A593-55.) The affidavit avers that Westport "would have included a 'Specified Entities Exclusion,' which would have stated that any claims or suits in any way arising out of the lawyer's or firm's involvement with [the] Templar [Entities] would have been excluded from coverage." (*Id.* at A594, ¶¶ 8-9.)

This affidavit, however, does not establish the materiality of Defendants' omission of the Templar Entities on their application. Westport does not clearly establish that Defendants' involvement with the Templar entities would have influenced Westport's decision on the issuance of the policy, its assessment of the risk, or its decision on premium rates. Westport does not allege that it would have chosen not to issue the Policy had Defendants disclosed the Templar Entities. And although the affidavit states that Westport may have assessed the risk differently,[11] it appears Westport would have issued a substantially similar policy had Defendants disclosed the Templar Entities. The affidavit merely avers that Westport would have included a "Specified Entities Exclusion"

---

[11] *See* ECF No. 81-1 at A593-95 ("Outside interests present law firms with potential conflicts of interest. Even if a conflict with the outside interest is not the cause of a loss, the mere allegation or appearance of a conflict often complicates and increases the expense of the defense of any resulting claim. It is therefore important for an underwriter to determine what outside interests exist when evaluating coverage to offer to a law firm in a professional liability policy.").

to explicitly exclude coverage for any claims involving the Templar Entities. (*Id.*) However, a separate Specified Entities Exclusion would not affect the risk underlying the Policy because the Policy's Outside Business Exclusion already broadly excludes coverage for all lawsuits involving outside businesses, including the Templar Entities. Moreover, Westport does not allege that it would have charged Defendants a higher premium had they disclosed the Templar Entities.[12]

Therefore, there is a genuine issue of material fact as to whether Defendants' omission of the Templar Entities on their application for the Policy was knowing and intentional and whether the omission was material. Accordingly, the Court will deny summary judgment on Westport's claims for rescission and voidance.

### 2. There Is A Genuine Dispute of Material Fact as to Whether Westport's Claims for Rescission and Voidance Are Barred by Laches

There is a genuine dispute as to whether Westport's claims for rescission and voidance are barred by the equitable doctrine of laches. "The doctrine of laches is an equitable bar to the prosecution of stale claims and is 'the practical application of the maxim that those who sleep on their rights must awaken to the consequence that they have disappeared.'" *Fulton v. Fulton*, 106 A.3d 127, 131 (Pa. Super. Ct. 2014) (quoting *Kern v. Kern*, 892 A.2d 1, 9 (Pa. Super. Ct. 2005)).

The question of whether laches applies is a question of law, but the question of laches itself is factual and is determined on a case-by-case basis. *Id.*; *J.H. France*, 668 A.2d

---

[12] In its brief, Defendants state that "Westport would potentially have had an opportunity to collect a higher premium through the disclosure of the Templar Entities." (ECF No. 87 at 30.) The Court does not construe this hypothetical statement as admitting the materiality of the omission because Westport does not allege that it would have charged a higher premium had Defendants disclosed the Templar Entities.

at 124 n.4; *2401 Pa. Ave. Corp. v. Fed'n of Jewish Agencies*, 489 A.2d 733, 736 (Pa. 1985); *In re Estate of Scharlach*, 809 A.2d 376, 382-83 (Pa. Super. Ct. 2002).

"[I]n order to prevail on an assertion of laches, respondents must establish: a) a delay arising from petitioner's failure to exercise due diligence; and b) prejudice to the respondents resulting from the delay." *Sprague v. Casey*, 550 A.2d 184, 187-88 (Pa. 1988). In actions at equity, like rescission, the applicable statute of limitations is used "as a frame of reference to evaluate any purported delay in support of a claim of laches." *In re Estate of Moskowitz*, 115 A.3d 372, 379 (Pa. Super. Ct. 2015) (quoting *Lipschutz v. Lipschutz*, 571 A.2d 1046, 1051 (Pa. Super. Ct. 1990)). Under Pennsylvania law, the statute of limitations in a breach of contract action is four years. *See* 42 PA. CONS. STAT. § 5525(a)(8).

Defendants sent Westport a draft copy of the Complaint in the Underlying Suit in October 2009. (ECF No. 81 ¶ 4.) The draft Complaint mentioned the Templar Entities several times. (ECF No. 88 at A849-75.) Namely, the draft Complaint alleges that Hippo concealed the creation of the Templar Entities from Morris (*id.* at A849-50 ¶¶ 15, 20) and that Hippo usurped real estate opportunities from Morris in favor of the Templar Entities. (*Id.* at A854 ¶¶ 34(i), 41(i).) Therefore, the Court finds that the draft Complaint put Westport on notice of the existence of the Templar Entities as of October 2009. Accordingly, Westport's claims for rescission and voidance would be time-barred if the four-year statute of limitations was triggered in 2009.

Westport argues that although the draft Complaint it received in 2009 clearly mentioned the Templar Entities, "a draft complaint could not provide Westport the facts sufficient to determine a material misrepresentation was made . . . in order to allow

-29-

rescission." (ECF No. 91 at 16.) Westport claims that it did not learn of the extent of Hippo's involvement with the Templar Entities until it obtained a transcript of Hippo's deposition sometime in 2016. Therefore, there is a genuine dispute of material fact as to when Westport learned the facts supporting its claims for rescission and voidance.

There is also a genuine dispute of material fact as to whether Defendants were prejudiced by Westport's delay in bringing its claims for rescission and voidance. "The party asserting laches as a defense must present evidence demonstrating prejudice . . . [such as] that a witness has died or become unavailable, that substantiating records were lost or destroyed, or that the defendant has changed his position in anticipation that the opposing party has waived his claims." *Commonwealth ex rel. Baldwin v. Richard*, 751 A.2d 647, 651 (Pa. 2000) (internal citations omitted). Defendants argue that they are prejudiced by Westport's delay because they have incurred legal fees defending the Underlying Suit and litigating this case. However, from the facts in evidence and the parties' briefs, it is not clear that Defendants changed their position or that Defendants were otherwise prejudiced by any delay.

Therefore, genuine disputes of material fact as to whether laches bars Westport's rescission and voidance claims preclude summary judgment in its favor on these claims. Conversely, Defendants are not entitled to summary judgment on Westport's claims for rescission and voidance.

## VII. Conclusion

For the reasons stated above, the Court finds there is no genuine dispute of material fact that the Policy's Outside Business Exclusion applies to Morris's claims

against Defendants in the Underlying Suit and Westport is entitled to judgment as a matter of law on Count I. Therefore, Westport has no duty to defend Defendants against the Underlying Suit. Accordingly, the Court **GRANTS** Westport's Motion for Summary Judgment on Count I for declaratory judgment. The Court **DENIES** summary judgment on Counts II and III for rescission and voidance because genuine disputes of material fact preclude summary judgment. The Court further **DENIES** Defendants' Cross-Motion for Summary Judgment.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WESTPORT INSURANCE | ) | CIVIL ACTION NO. 3:15-cv-251 |
| CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| HIPPO FLEMING & PERTILE LAW | ) | |
| OFFICES and CHARLES WAYNE | ) | |
| HIPPO, JR., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

AND NOW, this ___1st___ day of October 2018, upon consideration of the parties'

cross-motions for summary judgment (ECF Nos. 80, 85) and for the reasons set forth in the

accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that Westport's

Motion for Summary Judgment (ECF No. 80) is **GRANTED IN PART** and **DENIED IN**

**PART**. Westport's Motion for Summary Judgment is granted with respect to Count I for

declaratory judgment and is denied in all other respects. It is further ordered that

Defendants' Motion for Summary Judgment (ECF No. 85) is **DENIED**.

BY THE COURT:

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**